# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# 1:16-cv-387-FDW

| | |
|---|---|
| KARL L. COVINGTON, JR., ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | |
| ) | |
| ) | **ORDER** |
| ) | |
| KENNETH E. LASSITER, et al., ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**THIS MATTER** comes before the Court on a Motion to Dismiss by Defendants, (Doc. No. 21). Also pending before this Court is a Motion for Preliminary Injunction/TRO filed by Plaintiff. (Doc. No. 8).

**I.     BACKGROUND**

Pro se Plaintiff Karl L. Covington, Jr., a North Carolina prisoner incarcerated at Lanesboro Correctional Institution in Polkton, North Carolina, filed this action on December 1, 2016, pursuant to 42 U.S.C. § 1983, naming the following persons as Defendants: (1) Kenneth E. Lassiter, identified as the "overseer" of the "RDU" program for the North Carolina Department of Public Safety ("NCDPS"); (2) Christian Crawford, identified as the Superintendent of programs at Marion Correctional Institution; and (3) Keith Turner, identified as a Unit Manager at Marion. (Doc. No. 1 at 3). Plaintiff alleges a violation of his Fourteenth Amendment due process rights stemming from his commitment to the "Rehabilitative Diversion Unit" ("RDU")

Program[1] while he was incarcerated at Marion Correctional Institution. (Doc. No. 1). Plaintiff alleges the following facts:

> On 5-10-16 I was transferred to Marion C.I. for the RDU Program . . . . Upon arrival the rules were explained as well as the reason for my enrollment in the RDU program. On 5-18-16 I wrote a letter/grievance [to] Mr. Lassiter who is the program overseer as well as a grievance to Mr. Turner the unit manager of my unit.
> On 5-31-16, Mr. Kenneth Lassiter forward a response through Mr. Christian Crawford . . . and we had a verbal discussion. The conversation was that the RDU program is a restrictive housing for control purposes program and the plaintiff is enrolled due to his past disciplinary history. And on 6-1-16 the procedural due process to enroll plaintiff in program will be started soon.
> On 6-1-16, as Mr. Kenneth Lassiter/Christian Crawford said I received a notification of the recommended disciplinary disposition and my first classification hearing out of two. The facility classification is the first classification hearing where they judge on what action is necessary and either deny or agree or overturn it with another decision. . . . The facility classification board is not final it is just the first step. The actual hearing for FCC was on 6-6-16. When they recommended Max/I-Con/ RHCP (which is a control status and restrictive housing).
> On 6-3-16 as of the defendant unit manager Turner acknowledged Plaintiff's letter he sent a policy on RDU explaining that RDU is a program in adherence with conditions of confinement. . . .
> On 6-6-16 at the FCC hearing the taken by authority classification was overturned to RDU. . . . After FCC overturned the initial disposition on 6-1-16 they continued the procedural due process on to the DCA . . . . .
> On 6-14-16 I was notified of my DCA final disposition hearing . . . not for Max/I-Con/RHCP but for RDU.
> On 6-20-16 at the final disposition classification hearing I was enrolled in the RDU program.
> On 8-30-16 Plaintiff received his most recent incarceration summary, . . . show[ing] Plaintiff is not on restrictive housing for control purposes. It also shows Plaintiff is on general population inmate which proves that the control status Max/Icon/RHCP that was overturned on 6-1-16 . . . and the RDU status that the defendants say is a confined or restrictive housing for control purposes program is not the case. So basically the RDU program is violating the Plaintiff's

---

[1] As the Court discusses, <u>infra</u>, a description of the RDU program may be found at: https://www.ncdps.gov/reducing-use-segregation-allows-prisons-provide-new-programs-and-treatment and https://ncdps.s3.amazonaws.com/s3fs public/documents/files/Vera%20Safe%20Alternatives%20 to%20Segregation%20Initiative%20Final%20Report.pdf.

> 14th Amendment right because the procedural due process disposition was overturned but was still enforced under a disguised RDU program status.

(Id. at 3-7). Plaintiff also alleges that he is entitled to be classified as having general population status, but that the RDU program is "really another solitary confined program." (Doc. No. 4 at 2). Plaintiff alleges that his "rights were violated due to being placed on disciplinary solitary confinement after the classification board denied disciplinary control status." (Id.). As relief, Plaintiff seeks "injunctive relief as well as a declaratory judgment to be released from the RDU program and transferred to Maury C.I. and relieved of the disciplinary program." (Id. at 4).

On December 5, 2016, this Court ordered Plaintiff to provide documentation related to his inmate trust account and to document the exhaustion of his administrative remedies. (Doc. No. 3). On December 13, 2016, Plaintiff filed a document indicating that he had not exhausted his administrative remedies. (Doc. No. 6). On August 4, 2017, Defendants Lassiter, Crawford, and Turner filed the pending motion to dismiss, asserting that (1) Plaintiff failed to exhaust his administrative remedies, (2) the Complaint fails to state a claim against them, (3) they are entitled to qualified immunity, and (4) they enjoy Eleventh Amendment sovereign immunity from damages to the extent that Plaintiff has sued them in their official capacities. (Doc. No. 21). On August 16, 2017, this Court received notice from Plaintiff that he has been transferred from Marion to Lanesboro. (Doc. No. 25). On August 23, 2017, Plaintiff filed his brief in opposition to Defendants' motion to dismiss. (Doc. No. 27). This matter is therefore ripe for disposition.

**II.     STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) provides that a motion may be dismissed for

failure to state a claim upon which relief can be granted. A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint without resolving contests of fact or the merits of a claim. Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992), cert. denied, 510 U.S. 828 (1993). Thus, the Rule 12(b)(6) inquiry is limited to determining if the allegations constitute "a short and plain statement of the claim showing the pleader is entitled to relief" pursuant to Federal Rule of Civil Procedure 8(a)(2). To survive a defendant's motion to dismiss, factual allegations in the complaint must be sufficient to "raise a right to relief above a speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Thus, a complaint will survive if it contains "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). For the purposes of a Rule 12(b)(6) analysis, a claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556). The Court must draw all reasonable factual inferences in favor of the plaintiff. Priority Auto Grp., Inc. v. Ford Motor Credit Co., 757 F.3d 137, 139 (4th Cir. 2014). In a Rule 12(b)(6) analysis, the Court must separate facts from legal conclusions, as mere conclusions are not entitled to a presumption of truth. Iqbal, 556 U.S. at 678. Importantly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. However, well-pleaded factual allegations are entitled to a presumption of truth, and the court should determine whether the allegations plausibly give rise to an entitlement to relief. Id. at 679.

### III. DISCUSSION

Defendants first contend that this action must be dismissed because Plaintiff did not

exhaust his administrative remedies before bringing this lawsuit. For the following reasons, the Court agrees.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust his administrative remedies before filing a section 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. In Porter v. Nussle, 534 U.S. 516 (2002), the Supreme Court held that the PLRA's exhaustion requirement applies to all inmate suits about prison life. The Court ruled that "exhaustion in cases covered by § 1997e(a) is now mandatory." Id. at 524 (citation omitted). The Porter Court stressed that under the PLRA, exhaustion must take place before the commencement of the civil action in order to further the efficient administration of justice. Id.

In Woodford v. Ngo, 548 U.S. 81 (2006), the Supreme Court held that the PLRA exhaustion requirement requires "proper" exhaustion: "Administrative law . . . requir[es] proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" Id. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). In Jones v. Bock, 549 U.S. 199 (2007), the Supreme Court stated: "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Id. at 211 (citing Porter, 534 U.S. at 524).

Finally, the Supreme Court recently reiterated that, when pursuing administrative remedies, the PLRA only requires that inmates exhaust "available" remedies. 42 U.S.C. §

1997e(a). Under the PLRA, "available" means "capable of use to obtain some relief for the action complained of." Ross v. Blake, 136 S. Ct. 1850, 1859 (2016) (internal quotation marks omitted). In Ross, the Supreme Court recognized three potential situations that render administrative remedies not "available" to a complaining inmate. 136 S. Ct. at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859. For instance, "where the relevant administrative procedure lacks authority to provide any relief, the inmate has nothing to exhaust." Id. (internal quotation marks omitted). Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." Id. Third, administrative remedies are unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860. Finally, it is well settled that "[t]he burden of showing that administrative remedies were unavailable lies with the plaintiff." Mann v. Scott, Civ. Action No. 0:14-3474, 2015 WL 5165198, at *4 (D.S.C. Sept. 1, 2015).

The North Carolina Department of Public Safety ("NCDPS") has established, in its Administrative Remedies Procedures ("ARP"), a three-step procedure governing submission and review of inmate grievances. Moore v. Bennette, 517 F.3d 717, 721 (4th Cir. 2008). In his Complaint and in his response to the motion to dismiss, Plaintiff does not contend that he completed the internal ARP process before filing his Complaint. That is, Plaintiff freely admits

that he sent "letters" in lieu of grievances.[2] (Doc. No. 1-1 at 3; Doc. No. 27 at 1). Thus, taking Plaintiff's statements in his own Complaint and pleadings as true, he acknowledges that he has not exhausted his administrative remedies regarding these issues before initiating this lawsuit. Because Plaintiff has not demonstrated that he should be excused from compliance with the PLRA's requirements and because Plaintiff's failure to exhaust is undisputed, Plaintiff's claims against Defendants must be dismissed.

The Court further observes that, regardless of exhaustion, Plaintiff's claim against the moving Defendants is subject to dismissal for failure to state a claim for which relief may be granted. The Court notes that Defendants have argued in their motion to dismiss that Plaintiff fails to state a claim for either an Eighth Amendment violation based on cruel and unusual punishment or a Fourteenth Amendment due process violation. Defendants also contend that they are entitled to Eleventh Amendment sovereign immunity to the extent that Plaintiff has sued them in their official capacities for damages, and they further raise the defense of qualified immunity. In response to the motion to dismiss, Plaintiff states:

> The plaintiff has not brought any assertion to sue for monetary damages or sue for a[n] eighth amendment violation. The plaintiff is suing due to a 14th amendment violation when the FCC board recommended a restrictive housing control status (M-Con, I-con, RHCP), then at the final FCC disposition hearing recommended RDU which in paragraph 1 statement of facts the defendants referred to it as a restrictive housing control purpose status program which is really a step down from RHCP and is not a RHCP affiliation.

(Doc. No. 27 at 2). Since Plaintiff himself states that he is not bringing an Eighth Amendment claim, this Court will therefore only address his purported Fourteenth Amendment due process

---

[2] Plaintiff complains that the grievance process is not applicable in response to a claim arising out of a disciplinary hearing. Plaintiff's claim, however, arises out of his housing classification and not as a result of a finding of guilty or not guilty at a disciplinary hearing.

claim against the moving Defendants.

First, the only alleged personal participation by the moving is the fact that these defendants responded to Plaintiff's written complaints about being enrolled in the RDU program. Plaintiff does not allege that any of these Defendants took part in the classification process, and the mere response to Plaintiff's complaints did not subject Defendants to personal liability under Section 1983. Accord Steele v. Mobley, No. 5:14-CT-3298-F, 2016 WL 7655794, at *2 (E.D.N.C. Aug. 30, 2016). That is, absent an allegation of a "personal connection" between these specific Defendants and the alleged constitutional violation, Plaintiff's claims against these Defendants must fail.

Moreover, to the extent the Plaintiff is attempting to make a claim of supervisory liability against Defendants, he must establish three elements: (1) "that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) "that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'"; and (3) "that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Randall v. Prince George's Cnty., 302 F.3d 188, 206 (4th Cir. 2002) (citing Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)). Here, for the reasons stated below, because the prison's placement of Plaintiff in the RDU program did not violate Plaintiff's Fourteenth Amendment due process rights, the moving Defendants cannot he held liable under a theory of supervisory liability.[3]

---

[3] The Court also notes that it appears that Plaintiff's claim for declaratory and injunctive relief

Prison inmates do not enjoy the same procedural due process protections as ordinary citizens because the Due Process Clause of the Fourteenth Amendment to the United States Constitution only mandates procedural safeguards before an inmate may be punished by conditions dramatically different from the range of restraint contemplated by his sentence. Sandin v. Conner, 515 U.S. 472, 484 (1995). Thus, to succeed on a due process claim, inmates must show: (1) a denial of a liberty interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that the denial imposed an "atypical and significant hardship" in relation to prison life; and (3) that the process that the prison employed was constitutionally inadequate. Id.; accord Wilkinson v. Austin, 545 U.S. 209, 224-25 (2005).

Inmates do not have the constitutional right to be incarcerated in any particular prison, jail, or confinement facility of any particular security level. See, e.g., Meachum v. Fano, 427 U.S. 215, 223-24 (1976); Slezak v. Evatt, 21 F.3d 590, 594 (4th Cir. 1994). Prison officials are given broad discretion when classifying conditions of confinement such as determining whether Plaintiff required protective custody. See, e.g., Sandin, 515 U.S. at 485-86; O'Bar v. Pinion, 953 F.2d 74, 83 (4th Cir. 1991) (noting that "changes in conditions of confinement (including administrative segregation), and the denial of privileges are matters contemplated within the scope of the original sentence") (citing Montanye v. Haymes, 427 U.S. 236, 242 (1976)). Moreover, courts in the Fourth Circuit have long held that a temporary assignment to

---

against the moving Defendants Crawford and Turner, who were Marion employees at all relevant times, has been rendered moot because he was recently transferred away from Marion. That is, because Plaintiff is no longer under the control and custody of Crawford and Turner, the Court cannot order them to provide him any relief through an injunctive order. It is not clear whether Plaintiff is still enrolled in the RDU program now that he has been transferred to Lanesboro. In any event, as discussed herein, Plaintiff's due process claim is without merit.

disciplinary or administrative segregation does not implicate Fourteenth Amendment due process rights. See Allgood v. Morris, 724 F.2d 1098, 1101 (4th Cir. 1984) (addressing segregated protective custody); Ross v. Reed, 719 F.2d 689, 697 (4th Cir. 1983) (addressing administrative segregation). In Incumaa v. Stirling, 791 F.3d 517, 527 (4th Cir. 2015), the Fourth Circuit recently explained that the harsh or atypical conditions themselves do not provide the basis for a due process claim. Rather, the inmate must first demonstrate that state policy or regulation establishes a periodic review or other procedure which creates the liberty interest in avoiding onerous or restrictive confinement standards. When the parties concede that there is such a procedure, then the predominate focus of the inquiry is whether the challenged conditions "present atypical and significant hardship in relation to the ordinary incidents of prison life." Id. This means that courts first must determine what "the normative 'baseline' is: what constitutes the "ordinary incidents of prison life" for this particular inmate?" Id. (quoting Beverati v. Smith, 120 F.3d 500, 502, 503 (4th Cir. 1997)). Having identified the baseline, courts then must determine "whether the [challenged] prison conditions impose atypical and substantial hardship in relation to that norm." Id. The baseline can shift depending on the inmate's sentence or other factors, but "the general population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence." Id. at 527. With the general population established as the baseline, the inmate must establish that "his solitary confinement in security detention constitutes atypical and significant hardship in relation to the general population." Id. at 529.

      Here, although Plaintiff alleges that he has been subjected to excessive restrictions, he fails to identify an "atypical and substantial hardship" to implicate the Fourteenth Amendment.

Plaintiff suggests in his Complaint and accompanying documents that the RDU program amounts to solitary confinement. According to the materials referenced by Defendants in their motion to dismiss, the RDU program was created as a part of NCDPS's recent policy reforms regarding restrictive housing in the North Carolina prisons. See Wilcox, Digard, & Vanko, The Safe Alternatives to Segregation Initiative: Findings and Recommendations for the North Carolina Department of Public Safety, at p. 3 (Vera Institute of Justice, Dec. 2016) ("hereinafter "Wilcox Report"), *available at* https://www.ncdps.gov/safe-alternatives-segregation-report.[4] The materials state, specifically, that the RDU program was "designed to help people transition from Control to regular population through the provision of targeted behavioral programming and increasing privileges, congregate activity, and out-of-cell time." (Id.). The materials referenced by Defendants further describe the RDU program as follows:

> The most significant change in Control housing is the creation and implementation of the Rehabilitative Diversion Unit (RDU). This new unit is designed to house people who are already in RHCP or HCON or who are about to be placed into one of those classifications. In contrast to the restrictive conditions of RHCP, with extremely limited out-of-cell time and no programming, the RDU is a step-down unit with targeted behavioral programming, expanded privileges, congregate activity, and increasing out-of-cell time.
> RDU is planned as an 18-month program. During the first 12 months, incarcerated people are given programming and gain gradually increasing privileges and out-of-cell time, and in the final six months they have similar privileges and out-of-cell time to regular population. During the first 90 days, incarcerated people will be held in conditions that resemble traditional Control housing in regards to amount of out-of-cell time, lack of congregate activity, and lack of incentives and privileges. They will, however, participate in in-cell journaling. Out-of-cell time planned for the first six months of the program includes one-hour-a-day of outdoor recreation, weekly group programming after the first 90 days, and three-times-a-week opportunities to exercise in an exercise

---

[4] "Restrictive housing" generally refers to a housing unit that satisfies two conditions: it (1) holds incarcerated people separately from the regular population and (2) it places greater restrictions on out-of-cell time, congregate activity, and access to programming than in regular population. See id.

> cell.
> The RDU has its own specific disciplinary matrix tailored to the needs of this population; it emphasizes that "there will be times the participant will self sabotage, as 'doing well' may be something new they are unsure of how to experience. These consequences should be addressed in a manner of maintaining safety and security of self and others, while addressing the participant in a way as instructed in Motivational Interviewing and Crisis Intervention Training." If people in Phases I or II of the program are subject to a disciplinary segregation sanction of less than 30 days, they may return to where they were in the program upon completion of the sentence.
> Incarcerated people in Phase III will be classified as regular population, with corresponding privileges, out-of-cell time, and programming, but will still be part of the RDU. After finishing Phase III, incarcerated people will be able to return to regular population in another facility.

See id. at p. 45-46. Contrary to being a program of solitary confinement as Plaintiff contends, the RDU program appears to be a way to transition from restrictive housing back into the general population. Moreover, Plaintiff admits he took part in the classification process and that his time spent on the RDU is limited. See (Doc. Nos. 1, 19). Thus, while the conditions described by Plaintiff may be more burdensome that those of a regular population inmate, they are not so atypical or significant that his temporary exposure to them implicates a liberty interest. Accord Paylor v. Lewis, No. 5:12-ct-3103, 2016 WL 1092612, at *13 (E.D.N.C. Mar. 21, 2016) (finding that NCDPS's restrictive housing classification process satisfied due process where "plaintiff's placement on HCON was for a limited period of time during which he received regular review of his custody classification and ultimately was promoted back to general population").

Finally, as to Plaintiff's pending motion for a preliminary injunction, the Court will deny the motion because Plaintiff failed to exhaust his administrative remedies and, in any event, he has not shown that his RDU classification violates his due process rights. Thus, he has not demonstrated a need for a preliminary injunction or prospective injunctive relief in this case.

**IV. CONCLUSION**

Because Plaintiff failed to exhaust his administrative remedies, Plaintiff's claims against Defendants Lassiter, Crawford, and Turner must be dismissed. The dismissal will therefore be without prejudice. In any event, Plaintiff fails to make allegations showing a constitutional violation against any of the moving Defendants. Thus, even if Plaintiff had exhausted his administrative remedies, this action would be subject to dismissal on the merits.

**IT IS THEREFORE ORDERED** that:

(1) Plaintiff's action is **DISMISSED** without prejudice for failure to exhaust administrative remedies.

(2) Defendants' Motion to Dismiss, (Doc. No. 21), is **GRANTED**.

(3) Plaintiff's Motion for Preliminary Injunction/TRO, (Doc. No. 8), is **DENIED**.

(4) The Clerk of Court is directed to close this case.

Date Signed: August 29, 2017

Frank D. Whitney
Chief United States District Judge